Levi BIG CROW, as representative of the estate of his deceased spouse, Jennifer Big Crow, and Tamara Blue Thunder, Plaintiffs,

v.

Robert RATTLING LEAF, individually and as an employee of the Defendant United States Department of Interior, Bureau of Indian Affairs, Rosebud Sioux Tribe Law Enforcement Services Department, an agency of the United States of America, Defendants.

No. CIV. 03–3006.

United States District Court, D. South Dakota, Central Division.

Jan. 2, 2004.

Robin L. Zephier, Abourezk Law Offices, Rapid City, SD, for Plaintiffs.

Robert Rattling Leaf, White River, SD, Dana Hanna, Rosebud Sioux Tribe Court, Rosebud, SD, Jan Leslie Holmgren, U.S. Attorney's Office, Sioux Falls, SD, for Defendants.

## ORDER

KORNMANN, District Judge.

[¶ 1] Robert Rattling Leaf ("RRL"), a named defendant in this action brought pursuant to the Federal Tort Claims Act ("FTCA"), has filed a petition for certification pursuant to 28 U.S.C. § 2679(d)(3). This followed a very cursory and long delayed determination by the Attorney General (Doc. 30) that "individual-capacity representation of Mr. Rattling Leaf is not appropriate under 28 C.F.R. § 50.15 or 28 U.S.C. § 517 ..." Not until this court ordered the government to make a decision and file the same by September 18, 2003, was a decision made. The denial was filed on September 15, 2003. The accident in question in this lawsuit occurred on August 28, 1999. Administrative claims to comply with the FTCA were submitted to the Department on August 24, 2001. The claims were rejected administratively on January 13, 2002, and again on reconsideration in September, 2002.

[¶ 2] The denial filed by the Attorney General on September 15, 2003, stated it was based upon "information provided by the Department of the Interior ..." We have no idea what information was or was not provided by the Department of Interior ("Department"). Apparently, no consideration was given to what RRL has said. We know that RRL had submitted necessary documentation as to his status and this was provided to the Department in September of 2001.

[¶ 3] To support his petition for certification, RRL submitted a memorandum of law (Doc. 32) and his affidavit (Doc. 33). The court questioned (Doc. 34) whether proper service had been accomplished by RRL. I am now satisfied that proper service has been accomplished and the court therefore has jurisdiction. The United States filed a response (Doc. 37).

[¶ 4] Various programs of the Rosebud Sioux Tribe ("Tribe") are funded through so-called self-determination contracts entered into between the Tribe and the United States. These contracts are also called 638 contracts, reference being made to Public Law 93–638. Two such contracts are relevant here and will be discussed later.

[¶ 5] RRL is not a federal employee and makes no claim that he is. RRL

claims to be a "covered employee" under the FTCA due to the provisions of 25 U.S.C. § 450f, a part of the Indian Self-Determination and Education Assistance Act. The idea behind this statute was to increase tribal participation in the management of programs and activities on the reservation. Tribes may enter into contracts with the Secretary of the Department of Health and Human Services or the Secretary of the Interior to administer programs and services that would otherwise be run by the United States government. Where a self-determination (638) contract exists, the United States may be liable for the negligent acts of tribal employees when the employee in question is acting within the employee's scope of employment. The authority for this proposition is Pub.L. No. 101–512, codified at 25 U.S.C. § 450f historical notes.

[¶ 6] The government candidly admits that "the precise question of whether a tribal employee must be within the specific 638 contract under which he is employed has never been presented to a court before." This is apparently a case of first impression.

[¶ 7] The material facts as to the question presented by the petition for certification are not in dispute. RRL was the director of the Natural Resources Department of the Tribe. RRL was so trained to act as a law enforcement officer. He was a certified law enforcement officer through the State of South Dakota. He was a commissioned law enforcement officer through the Tribe. He was authorized to make arrests for all violations of tribal law, not just laws in the Game, Fish and Parks Code. He was issued a firearm and all other "tools of the trade" for a law enforcement officer. At the time of the accident, he was in uniform and driving a vehicle belonging to the Bureau of Indian Affairs ("BIA"). The vehicle was equipped with a police radio to allow communica-

tions between and among tribal police officers and RRL. He was on patrol and heard on the police radio a request for assistance from a police officer for the Tribe. He was the closest officer and responded as requested. The accident and tragic death of Ms. Big Crow followed. There is not even a claim that RRL was acting for some independent purpose of his own or on some personal frolic; he was not doing so.

[¶ 8] The United States has furnished a declaration (Doc. 38) by BIA official Richard Zephier to which is attached a self-determination contract (exhibit A). I will refer to this as the catch-all contract since it covers budgets and programs for children and family activities, economic/resource development, forestry, natural resources, the Spotted Tail Crisis Center, tourism, tribal court, truancy, tribal utilities commission, tribal work experience program, and water resources. Other attachments are the self-determination law enforcement contract (exhibit B) and a payroll record (exhibit C) showing the employment of RRL pursuant to the catch-all contract.

[¶ 9] Looking first at the self-determination catch-all contract between the Tribe and the BIA, there is little that is legally significant in such contract to be of assistance in this case. As to natural resources, the director was to be responsible for administering and coordinating all activities for the tribal natural resources program and for fulfilling contract obligations. RRL was not only the director of the resources program but also acted as a ranger. Funds are allocated in the contract "to cover cost of training officers in a(sic) approved Law Enforcement Academy."

[¶ 10] I have also read the self-determination law enforcement services contract between the Tribe and the BIA. The Tribe

is referred to as the "contractor." Looking at page four, the Tribe promised the BIA to provide all necessary qualified and/or licensed personnel, equipment, materials and services "to perform all tribal law enforcement investigation, enforcement and detention services" on the reservation. That is exactly what RRL was doing at the time of the accident. Law enforcement services were to be performed "in accordance with the laws, rules, regulations, customs, and procedures established by Federal, Tribal, and local governments applicable under the jurisdiction and service area of the ... Tribe ..." It was obviously, if nothing else, the "custom" and a "procedure" of the Tribe to have RRL assist other law enforcement officers operating under the 638 contract. Such "procedures" and "custom" were obviously established by the Tribe. The grant of authority from the BIA to the Tribe under numbered paragraph one on page four is as broad as possible. The Tribe "shall provide assistance to the Bureau of Indian Affairs, other federal and state law enforcement officials as necessary in the investigations of tribal, state or federal offenses that occur on the reservation." Interesting enough, one of the functions under this contract was the "[E]nforcement of applicable game and fish laws or ordinances", exactly what RRL was largely charged with supervising and doing personally. (See page five, (6)C). Looking at page eight, the Tribe "shall specify the type of firearms, ammunition and auxiliary equipment to be used by the law enforcement officers of the tribe." This provision is the only authorization in either contract for RRL to have been issued a firearm and to carry it, as he did regularly and on the night in question. Further, "[O]nly those sworn personnel who are officially qualified to carry non-lethal weapons may do so." It is unknown what non-lethal weapons were carried by RRL. Common sense would tell us that if he is authorized to carry a firearm, he would be authorized to carry non-lethal weapons. Looking next at page ten, "[O]nly those employees assigned duties as law enforcement officers and qualified under Section 9 of this contract may be authorized to carry firearms or make arrests. Each qualified law enforcement officer shall be required to carry a Tribal Commission Card." All of this describes RRL, among others.

[¶ 11] No requirement can be found in statute, regulation, or contract to the effect that a tribal employee paid under one self-determination contract cannot be performing functions under another self-determination contract. It is common knowledge and I take judicial notice that properly trained and certified law enforcement officers are too few and far between on the Indian reservations in South Dakota. Common sense tells us that RRL was acting appropriately and within the scope of his employment in assisting another law enforcement officer on the night in question. He was not a biologist or wildlife specialist but a law enforcement officer. He was doing exactly what the Tribe had promised to do and what the BIA had required the Tribe to do under the law enforcement services contract. Under the undisputed facts of this case, it is legally immaterial that he was paid pursuant to one contract rather than another.

[¶ 12] RRL has requested an evidentiary hearing. The United States has made no such request. Given the undisputed underlying facts, an evidentiary hearing would be a waste of time and money and will not be conducted.

[¶ 13] This petition for certification (without reference to the alleged facts of the accident) represents an excellent example of an old maxim that is too often true: "No good deed goes unpunished." The Attorney General has proceeded in a much delayed, somewhat crabbed, and er-

roneous fashion. RRL was clearly acting within the scope of his employment. The decision of the Attorney General to refuse to so certify should be reversed. The petition for certification should be granted.

[¶ 14] Now, therefore,

[¶ 15] IT IS ORDERED, as follows:

1) The refusal of the Attorney General to certify that Robert Rattling Leaf was acting within the scope of his employment is reversed and this court grants the petition for certification (Doc. 31).

2) Robert Rattling Leaf was acting within the scope of his employment and the United States is substituted for him as a party defendant.

[¶ 16] Dated this 2nd day of January, 2004.